IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | |
|---|---|
| Valerie Coleman,<br><br>    Plaintiff,<br><br>vs.<br><br>Centerra Group, LLC,<br><br>    Defendant. | Case No:<br><br>**COMPLAINT**<br>**(Jury Trial Demanded)** |

COMES NOW Plaintiff Valerie Coleman (hereinafter "Plaintiff") and alleges the following in her Complaint against Defendant:

**PARTIES**

1. Plaintiff is a citizen and resident of Grovetown, Georgia. Defendant is a limited liability company organized under the laws of the State of Deleware and authorized to do business in the State of South Carolina.

2. Plaintiff seeks more than $75,000 in damages as a result of Defendant's acts and omissions as alleged herein.

3. This Court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. §2000e-5(f)(3) (Title VII of the Civil Rights Act) and 28 U.S.C. §1331 (federal question).

4. Venue is proper in this District, as the most substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District, and

Defendant does business relating to the events and omissions alleged herein in this District.

## FACTUAL BACKGROUND

5. Each and every allegation set forth above is reiterated as if fully set forth herein.

6. Defendant is a federal contractor providing security services at the Savannah River Site.

7. Defendant hired Plaintiff as an employee in February 2002.

8. Her most recent position is that of Lieutenant in the Security Operations Division, a position she has held since being promoted in 2007.

9. As recently as December 2015, Plaintiff was always evaluated as exceeding the employer's expectations and received and corresponding increase every time raises were available to employees.

10. During the discussion of her December 2015 evaluation with Captain James E. Frails and Major Mark Moon, her Caucasian supervisor, there was no mention of a need for improvement in Plaintiff's interactions with others.

11. In November 2015, Plaintiff began to hear about complaints from a female subordinate regarding Plaintiff counseling her regarding her performance.

12. The employee, Judy Sweeney, had filed several complaints about African-American coworkers and supervisors in the past.

13. After Plaintiff, Captain Frails, and SPO Sweeney met to attempt to clear the air, Plaintiff and Captain Frails believed the issue had been resolved.

14. Unfortunately, the issues with SPO Sweeney continued.

15. In January 2016, Plaintiff discovered that SPO Sweeney was violating a company policy.

16. Plaintiff called SPO Sweeney into the office, discussed the matter, and advised her to sign a Notice of Pending Discipline, in part because of her failure to accept directives or guidance from Plaintiff.

17. She submitted the writeup to Capt. Frails, who then gave it to Major Moon.

18. Plaintiff heard nothing in response, and Major Moon did not discipline the employee.

19. Instead of being supported when she reported the disciplinary concerns to Major Moon, she was told to avoid the subordinate as much as possible.

20. When she questioned Mr. Moon about why the subordinate was not the one called upon to change her behavior, Major Moon became angry and would not give her an answer.

21. He then said he referred the matter for an EEO investigation against Plaintiff, which, to her knowledge, was not the practice and had never been done before to her knowledge.

22. A couple weeks later, Plaintiff was informed that SPO Sweeney had started a rumor that Plaintiff, who is married, and Capt. Frails were having an affair.

23. Based upon the subordinate's conduct, it appeared that SPO Sweeney did not like taking orders from an African-American female.

24. Though Plaintiff and Capt. Frails met with Major Moon to discuss the issue, nothing was done to SPO Sweeney.

25. Plaintiff had heard about the rumors from Sgt. Darrell Johnson and reported the information to Melinda Cato of Dispute Resolution and Compliance.

26. Though Plaintiff asked Ms. Cato, who was friends with SPO Sweeney, to view Sgt. Johnson's text messages, she refused to do so and issued a letter of February 3, 2016, indicating that the report was unsubstantiated.

27. She said that, since SPO Sweeney would not admit to it, the company had no proof of the allegations about the affair.

28. Major Moon's failure to support Plaintiff in her role as a supervisor was troubling.

29. If Plaintiff had an issue with an employee, she was immediately viewed as the problem; if her Caucasian or male counterparts had a problem with a subordinate, the subordinate was corrected.

30. She emailed Chuck Shaver, to whom Major Moon reported, to discuss her hostile work environment, which she believed was based upon her gender and race.

31. Thereafter, Plaintiff met with Mr. Shaver.

32. She discussed with him her concern that Major Moon advised her that she should leave the room when SPO Sweeney was present and that had otherwise failed to support her as a supervisor.

33. Mr. Shaver agreed that she should be respected in her role as a supervisor that the comment was not appropriate to say about a supervisor, and that Plaintiff would not be required to leave the room to appease SPO Sweeney.

34. Prior to this time, Plaintiff had had no issues with Mr. Shaver.

35. On or about February 13, 2016, Plaintiff heard from several coworkers and subordinates that Major Moon and John Hurley, who Plaintiff had overheard referring to her as a "n-----r" and a "black b----," were encouraging anyone who had ever had an issue with Plaintiff to write a statement against her.

36. The employees were forced to write statements, even if they did not want to do so.

37. On or about February 29, 2016, Plaintiff contacted Mr. Shaver to ask if she was being investigated.

38. Mr. Shaver claimed that the statements were being requested because several employees had made complaints about her.

39. The same day, another employee was approached and asked to write a statement, but he refused.

40. This continued in the days thereafter.

41. The environment was oppressive and caused Plaintiff significant angst and embarrassment.

42. On March 3, 2016, Plaintiff filed an Employee Concerns Report Form about the environment to which she was being subjected.

43. On March 7, 2016, George Parks, a union agent representing Plaintiff's interests, opposed Major Moon's conduct and explicitly described it as a "racial witch hunt" in a memorandum to Ray Smith, Deputy General Manager.

44. The same day, Plaintiff was sent confirmation of her employee concern.

45. The following day, Plaintiff was suddenly referred to the First Sun Employee Assistance Program because she was allegedly "demeaning to others," "threatening," and "cursing."

46. The purpose of the referral, as indicated in the Workplace Referral Form, was to improve her day-to-day interactions with others, but if she failed to improve, the consequences included the "potential for progressive discipline" and a possible performance improvement plan.

47. As set forth in the form, there were no prior steps or disciplinary action taken to address the issue.

48. She was forced to sign a release of information to Mr. Shaver, who had simultaneously said that there were no grounds for discipline and that participation was voluntary but that she could be terminated (without progressive discipline) if she engaged in such conduct in the future.

49. Her male counterparts commonly engaged in the alleged conduct without recourse.

50. In the meeting, Mr. Shaver claimed that several employees had raised concerns about Plaintiff's conduct in statements, which were solicited by Major Moon and John Hurley.

51. Mr. Shaver refused to let her see the statements and brought up incidents occurring over a year prior that had not been significant enough to address in her evaluation but were suddenly significant enough to warrant EAP referral.

52. He could cite no specific events in which Plaintiff was allegedly abusive.

53. After the meeting, Plaintiff's access to certain secure areas was removed, and she was drug tested.

54. She also was removed from the Human Reliability Program.

55. Though she did not agree with the referral to the EAP, she attended nonetheless out of fear for her job security.

56. On March 25, 2016, Plaintiff was accused of harassment by a Hispanic subordinate, who was angry about Plaintiff's inadvertent mispronunciation of her name and reported it to Major Moon.

57. Once again, Major Moon and John Hurley were on a mission to have Plaintiff disciplined and began collecting statements.

58. Though the employee handled the situation improperly, Major Moon advised Plaintiff that she couldn't afford any more disciplinary issues, though she had never had anything that could be considered "discipline" until the EAP referral (which they claimed was not discipline).

59. After the matter was investigated, everyone spoke on Plaintiff's behalf and said the subordinate was the one out of line.

60. The subordinate was not written up, however, since Plaintiff was the manager at issue.

61. When it came to Plaintiff, the employee always got the benefit of the doubt, with the matter couched as a "misunderstanding."

62. On April 11, 2016, Plaintiff was contacted by Ray Smith, Deputy General Manager to discuss her March 3, 2016, complaint filed with the United States Department of Energy.

63. At the meeting with Mr. Smith, Plaintiff discussed all of the discriminatory and retaliatory acts to which she had been subjected.

64. She told him that she believed that she was the victim of race and gender discrimination and that she was subjected to differential treatment for having a strong personality when her counterparts outside of her protected class were not.

65. Mr. Smith said that he wanted to try to resolve everything and that it should have been handled differently.

66. He agreed that had the right to come to work and not have unfavorable working conditions.

67. He thought matters had been handled inappropriately and said she did not have to continue going to the EAP.

68. The meeting with Mr. Smith brought no comfort, as the working conditions did not improve.

69. In May 2016, two or three weeks prior to the June "force-on-force" exercise for which the participating supervisors would get accolades if successful, Plaintiff was transferred off of her shift and replaced with a white male, who ended up getting the benefits of the exercise.  (

70. When Plaintiff asked why Major Moon removed her, he said he was trying to look out for her so she would not have unfavorable incidents, though he was the one responsible for her "unfavorable incidents."

71. In the staff meeting, Major Moon had advised that it was for tactical reasons and that Plaintiff "has some issues."

72. When she approached Major Moon about it, he became irate and demanded to know who gave her the information. Instead of telling her what "issues" she had," he was fixated on who disclosed his comments about Plaintiff and called in Carl Wright, who provided the information, in front of Plaintiff, to interrogate him.

73. In the months since Plaintiff complained about the gender- and race-based discrimination to which she was subjected, Major Moon went out of his way to avoid Plaintiff.

74. If he had to contact a supervisor on her shift, he contacted someone else on the shift instead of Plaintiff and used emails to communicate when he was just down the hall, avoiding all personal interaction with her.

75. Additionally, in late August, Plaintiff was advised that her security clearance was in jeopardy due to the EAP referral that took place after her complaint of race discrimination.

76. On or about October 18, 2016, Plaintiff submitted a verified complaint of race- and gender-based discrimination to the Equal Employment Opportunity Commission (EEOC).

77. On December 30, 2016, Plaintiff signed the Charge of Discrimination prepared by the EEOC following the submission of the verified complaint.

78. On January 13, 2017, the EEOC issued a Notice of Right to Sue.

**FOR A FIRST CAUSE OF ACTION**
**(Title VII of the Civil Rights Act of 1964, *et seq.*, as amended – Gender-Based Disparate Treatment)**

79. Plaintiff repeats and realleges the paragraphs above as if set forth herein verbatim.

80. Plaintiff, a female, is a member of a protected class.

81. At all times relevant to her claims against Defendant, Plaintiff was qualified for her position and was performing in a manner meeting the employer's legitimate expectations.

82. She was subjected to adverse employment action and differential treatment for engaging in conduct of less than or similar severity to conduct in which her similarly-situated male counterparts engaged without recourse.

83. She also received less support from her supervisor than her male counterparts.

84. But for Plaintiff's gender, the adverse employment action and differential treatment to which Plaintiff was subjected would not have occurred.

85. As a result of Defendant's disparate treatment, Plaintiff has suffered substantial damages, including, but not limited to, anxiety, a loss of enjoyment of life, and other suffering, for which Defendant is liable.

86. Accordingly, Plaintiff is entitled to an award of compensatory damages, post-judgment interest, attorneys' fees and costs, injunctive relief, and such other and further legal and equitable relief from Defendant as deemed proper by this Court, to the fullest extent available under the applicable law.

87. Because Defendant's conduct was malicious and in reckless disregard of Plaintiff's rights, Plaintiff is entitled to an award of punitive damages, to be determined by a jury, to punish Defendant and deter Defendant from engaging in such discriminatory conduct in the future.

### FOR A SECOND CAUSE OF ACTION
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e,** *et seq.***, as amended – Race-Based Disparate Treatment)**

88. Plaintiff repeats and realleges the paragraphs above as if set forth herein verbatim.

89. Plaintiff, who is African-American, is a member of a protected class.

90. At all times relevant to her claims against Defendant, Plaintiff was qualified for her position and was performing in a manner meeting the employer's legitimate expectations.

91. She was subjected to adverse employment action and differential treatment for engaging in conduct of less than or similar severity to conduct in which her similarly-situated Caucasian counterparts engaged without recourse.

92. She also received less support from her supervisor than her Caucasian counterparts with respect to subordinate discipline, particularly Caucasian subordinates, resulting in a substantial hardship upon her in the workplace.

93. As a result of Defendant's disparate treatment, Plaintiff has suffered substantial damages, including, but not limited to, anxiety, a loss of enjoyment of life, and other suffering, for which Defendant is liable.

94. Accordingly, Plaintiff is entitled to an award of compensatory damages, post-judgment interest, attorneys' fees and costs, injunctive relief, and such other and further legal and equitable relief from Defendant as deemed proper by this Court, to the fullest extent available under the applicable law.

95. Because Defendant's conduct was malicious and in reckless disregard of Plaintiff's rights, Plaintiff is entitled to an award of punitive damages, to be determined by a jury, to punish Defendant and deter Defendant from engaging in such discriminatory conduct in the future.

**FOR A THIRD CAUSE OF ACTION**
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended - Retaliation)**

96. Plaintiff repeats and realleges the paragraphs above as if set forth herein verbatim.

97. Plaintiff engaged in protected activity when she and her advocates complained to her supervisors about the gender- and race-based discrimination to which Plaintiff was being subjected.

98. Thereafter, Plaintiff was subjected to discriminatory and retaliatory discipline, isolation, and other hostile treatment that would dissuade any reasonable worker from engaging in such protected activity.

99. These acts were severe and pervasive to such an extent as to alter Plaintiff's terms and conditions of employment.

100. Under the circumstances, there is a causal connection between the adverse action and Plaintiff's opposition to Defendant's practices, particularly given the temporal proximity between the protected activity and the adverse action.

101. Accordingly, Plaintiff is entitled to an award of compensatory damages, post-judgment interest, attorneys' fees and costs, injunctive relief, and such other and further legal and equitable relief from Defendant as deemed proper by this Court, to the fullest extent available under the applicable law.

102. Because Defendant's conduct was malicious and in reckless disregard of Plaintiff's rights, Plaintiff is entitled to an award of punitive damages, to be determined by a jury, to punish Defendant and deter Defendant from engaging in such discriminatory conduct in the future.

WHEREFORE, Plaintiff, based on her Complaint set forth above, prays for the following relief: a jury trial on all causes of action set forth herein; that judgment be entered in her favor, and against Defendant on all causes of action; that she be awarded compensatory damages in an amount to be determined by a jury, but not less than an amount sufficient to compensate her fully for all damages she has incurred and will in the future incur, along with the loss of peaceful enjoyment of life, wages, and opportunity; for an award of punitive damages as determined by a jury in an amount sufficient to impress upon the Defendant the seriousness of its conduct and to deter

similar conduct in the future; for an award of pre-judgment and post-judgment interest; and for such other and further relief as the Court deems just and proper.

Respectfully submitted,

__/s/ Bryn C. Sarvis_____
Bryn C. Sarvis (#10478)
SARVIS LAW, LLC
3347 Augusta Highway, Suite B
Gilbert, South Carolina 29054
Phone (803) 785-5525/Fax (803) 785-5526
bsarvis@sarvislaw.com

**ATTORNEY FOR PLAINTIFF**

Dated: April 13, 2017